**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHRISTOPHER CHENEY,

              *Plaintiff*,

*v.*

CIVIL ACTION NO. 2:16-cv-12950

DISTRICT JUDGE STEPHEN J. MURPHY, III

MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

              *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 21)

## I.     RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioners determination that Cheney is not disabled. Accordingly, **IT IS RECOMMENDED** that Cheney's motion for Summary Judgment, (Doc. 18), be **DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and this case be **AFFIRMED**.

## II.     REPORT

### A.     Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Christopher Cheney's ("Cheney") claim for a period of disability and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et*

*seq.* (Doc. 13). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 21).

Cheney previously filed a concurrent claim for DIB and SSI beginning November 28, 1983 (his date of birth), as a disabled adult child. (Tr. 13). The prior ALJ denied his claims after a hearing in a decision dated September 19, 2006, and this decision became binding. (*Id.*).

On December 23, 2010, Cheney filed an application for SSI, alleging a disability onset date of November 28, 1983.[1] (Tr. 276-82). The Commissioner denied his claim. (Tr. 72-75). Cheney then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on November 6, 2012, before ALJ Ethel Revels. (Tr. 79). The ALJ denied his claim, (Tr. 79-89), but the Appeals Council remanded, (Tr. 94-98), and the ALJ held another hearing. (Tr. 30-71). At the hearing, Cheney—represented by his attorney—testified, alongside Vocational Expert ("VE") David Herriera. (*Id.*). The ALJ's written decision, issued April 24, 2015, found Cheney not disabled. (Tr. 13-23). On June 17, 2016, the Appeals Council denied review, (Tr. 1-7), and Cheney filed for judicial review of that final decision on August 12, 2016. (Doc. 1).

B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the

---

[1] At the hearing, the ALJ noted that the relevant period for SSI benefits begins on the date of filing, which was "December 17, 2010." (Tr. 13). This date falls several days before the date listed on Cheney's application—*compare* (Tr. 276), *with* (Tr. 13)—but because Cheney raises no issue with this error, I consider it harmless.

correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the

Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Cheney not disabled under the Act. (Tr. 13-23). At Step One, the ALJ found that Cheney had not engaged in substantial gainful activity since his SSI filing date of December 17, 2010. (Tr. 15-16). At Step Two, the ALJ concluded that the following impairments qualified as severe: low average intelligence, mild hand tremors, and a pervasive development disorder. (Tr. 16). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 16-18). Thereafter, the ALJ found that Cheney had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels except that:

because of occasional hand tremors and anxiety he is limited to simple, routine tasks such as those in jobs rated at the SVP 1-2 level secondary to occasional limitations in ability to maintain concentration for extended periods but not more than 10 percent of the workday, as well as occasional limitations in the ability to understand, remember and carry out detailed instructions; need for low stress work (defined as involving no work with the general public, no operating at a production pace, and no work with groups over five people in proximity to the work area); and only frequent handling.

(Tr. 18-21). At Step Four, the ALJ found Cheney had no past relevant work. (Tr. 21). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (Tr. 21-23).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Cheney's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Function Report

On January 15, 2011, Cheney filled out a Function Report, which appears in the record. (Tr. 331-38). Describing his conditions, he wrote: "Bad memory loss, [h]ave trouble with mild shaky hands, can't stand for long periods of time due to leg pains that come and go." (Tr. 331). In a typical day, he would "[e]at when I wake then sit on computer or I watch movies on my TV [be]cause I don't have cable and don't care to." (Tr. 332). At the time of writing, he helped his wife "keep track of bills and be there [for] her when she need[s] me." (*Id.*). Before his illnesses set in, he did "not need the extra

6

help for small tasks like finding thing[s]." (*Id.*). At night sometimes, "my legs ache . . . so I get no sleep." (*Id.*). To ensure he doesn't forget to take care of personal needs and grooming, he takes notes. (Tr. 333).

Prompted about daily activities, Cheney detailed no particular issues. He wrote that he prepares his own meals daily, though the time required depended on "whether it's instant like a TV dinner or home cooked!" (*Id.*). He also took out the trash, cycled laundry, and washed dishes. (*Id.*). Because he lived in an apartment, his landlord took care of yard work and maintenance. (Tr. 334). He ventured outside "often" to walk or ride his bicycle. (*Id.*). He held no driver's license and did not drive. (*Id.*).

When shopping, he sought food, video games, and movies. (*Id.*). "I window shop a lot and I'm gone a while." (*Id.*). He remained able to pay bills and count change but avoided handling a savings account or using a checkbook or money orders. (*Id.*). This was because his memory loss "problem" caused him to "recheck myself 3 or 4 times to make [sure] I counted it right." (Tr. 335). As hobbies and interests, he listed "watching movies, playing video games or surf[ing] the web on my computer." (*Id.*). He spent time with his wife, "talk[ed] on [the] computer or phone," and "visit[ed] family [and] my parents when I come for a visit." (*Id.*). On a regular basis, he visited the mall, goodwill, Walmart, and church. (*Id.*).

In a section seeking information about his abilities, Cheney marked difficulties with: lifting, standing, memory, and using his hands. (Tr. 336). "I can't lift for long periods of time, my hands shake when I do tasks like using a [w]rench or screw-driver or others, my memory causes me to [lose] my wallet or keys or phone from time to time."

(*Id.*). On his best days, he could walk "a mile or two" before needing to stop, but on bad days he could only make it "a few blocks." (*Id.*). His capacity to follow written instructions depended "on what I'm doing and what they wrote," but he described his ability to follow spoken instructions as "good" if "explained to me [until] I'll understand." (*Id.*). His ability to handle stress was "so so" because he had "a low stress level." (Tr. 337).

Cheney's mother, Deborah Cheney, also filled out a Third-Party Function Report on January 11, 2011. (Tr. 323-30). Her forecast appears somewhat more dire than Cheney's at points, as she rates his ability to follow directions poorly and enumerates a number of difficulties Cheney encounters in activities of daily living—such as not changing clothes, bathing infrequently, eating infrequently, and forgetting to do household chores, (Tr. 324)—but otherwise remains consistent with what Cheney wrote himself.

### ii.      Cheney's Testimony at the Administrative Hearing

Opening his testimony, Cheney clarified several points for the ALJ, noting that his weight was the same as it was at the last hearing, and that he was divorced. (Tr. 36). He used to work at Sonic Restaurant, a job he received through Goodwill Industries, and they accommodated his limitations. (Tr. 36-37). While there, he was a cook, "flipping burgers . . . and running the fryers a little bit . . . ." (Tr. 39). He could not work the cash register "because I'm a lot slower than others." (*Id.*). He had no other work experience. (Tr. 38). He generally remembered having "good attendance" while working at Sonic, though he

8

had difficulty remembering. (Tr. 47). When he missed days, it was because of weather conditions and Sonic's inability to send someone to "come pick me up." (Tr. 48).

The ALJ asked Cheney why he thought he could not work, and Cheney indicated that this was "[b]ecause the short-term, long-term memory loss, high stress at work. I know there's more but I can't think of it." (Tr. 43). He then extrapolated on his memory trouble: "It's something I've had for as long as I can remember where one then I can remember something perfectly and then the next minute I can't remember nothing at all. It seems to come and go." (*Id.*). This problem made him feel dependent on others, particularly with respect to handling finances. (Tr. 44). His parents would sometimes "have to remind me to pretty much take a shower or remind me as far as dates if they – if we've got places we're supposed to run, like, for instance, change an appointment, make sure I'm up on time. Keeping track of going to my appointment . . . ." (*Id.*). When he felt overwhelmed, he would "distance myself from other people and just stay to myself." (Tr. 45). This usually involved retreating to his parents' basement, where he lived. (*Id.*). His younger brother, age fifteen- or sixteen-years old, generated significant stress because "[h]e's the opposite of me. He's ADHD so he's hyperactive so . . . [they would] get at each other from time to time." (Tr. 46).

Speaking to his hygiene, Cheney offered how he tried "to keep up with it on a daily basis as far as taking a shower, brushing my teeth, doing the, you know, the normal getting dressed, things of that nature but sometimes I just forget busy doing other things." (*Id.*). He keeps reminders for himself. (*Id.*). At times, he went three or four days between showers. (Tr. 47). His parents asked him to attempt various tasks—such as caring for the

9

horse on the property, washing dishes, taking out the trash, cleaning the cat litter, and a variety of other odd jobs—and he noted an ability to accomplish them. (Tr. 56). He did these tasks several times each week. (Tr. 57).

In a typical day, Cheney would "go to bed . . . sometime around 3 a.m. and I usually wake up anywhere between 10:30, 12 o'clock maybe 1:00 at the latest. And I'm usually staying downstairs until my parents wake up because they're still stuck on night shift as far as their sleeping habits. So I'm usually up before them but I usually just stay downstairs and wait for them to get up unless there is stuff that they've told me the night before that they've written down that they want me to take care of." (Tr. 49). He spent the day on his computer, and might "watch a little TV until somebody wakes up." (*Id.*). His energy was sometimes "good" but other times only "half there or non-existent." (*Id.*). He indicated that he has "[a] little bit" of trouble sleeping "but I think that might be just because of the fact that I've got a futon I sleep on and I don't know if my body is used to it anymore." (Tr. 50). Asked how he felt, he said "I wouldn't say depressed but just kind of down just because I'm not fully all there yet." (*Id.*). "It's partly my memory just for the fact, like, I said I can't remember a lot on average but it also can be just for the fact, like, I said I'm tired . . . ." (Tr. 51). Since moving to Michigan two years before, Cheney had trouble making friends, though he did take his bicycle to a "bike show . . . . free for anybody that had a vintage bicycle that wanted to come down and . . . be a part of . . . the function." (Tr. 61-62). He noted he still had trouble in groups of "more than the average five people." (Tr. 64).

Cheney then testified to some physical issues he suffered from. His stomach gave him trouble, for which he took medication. (Tr. 52-53). "The big one I've sort of noticed lately . . . is that I've been shaking more." (Tr. 53). He could not recall doctors giving him any advice or diagnosis with respect to this issue, though, since "when I was younger because I've had it since I was little." (Tr. 54). The tremors made rebuilding computers— one of his hobbies—substantially more difficult "because with my hands shaking it's too complicated to sit there and try to take them apart anymore and mess with any of the intricate parts because stuff keeps dropping." (Tr. 60-61).

### iii. The VE's Testimony at the Administrative Hearing

The ALJ posed a first hypothetical to the VE, asking him to assume a person with limitations such that "that person would need work that is simple routine tasks such as those jobs at the SVP 1 or 2 level because I do find occasional limitations and ability to maintain concentration for extended periods but not off task more than ten percent of the day as well as an occasional limitations [sic] in the ability to understand, remember and carry out detailed instructions. That work must also be in – must be low stressed work and I define low stress work as no work with the general public, no operating at a production pace, no work with large groups over five people in proximity in the work area. If you assume that, would a hypothetical claimant be vocationally qualified to perform work at all exertional levels?" (Tr. 65). The VE noted that jobs existed for such a person at "all exertional levels," though the limitation to groups of five people reduced the overall numbers by about ninety-five percent. (*Id.*). These included: "finisher" at the sedentary exertional level—with 240 regional job availabilities and 1,400 national job

availabilities—"assembler production worker" at the light exertional level—with 500 regional job availabilities and 2,200 national job availabilities—"call assembler" at the medium exertional level—with 400 regional job availabilities and 5,000 national job availabilities—"janitor or building cleaner" at the heavy exertional level—with 200 regional job availabilities and 7,000 national job availabilities—and "janitor or building cleaner" at the light exertional level—with 600 regional job availabilities and 4,000 national job availabilities. (Tr. 66-67). This amounted to a total of 20,000 regional job prospects and 400,000 national job prospects. (Tr. 67). There was also a "machine operator tender" at light exertional level, with 700 regional job availabilities and 14,000 national job availabilities; the numbers decreased at medium exertional level, with 400 regional job availabilities and 10,000 national job availabilities. (Tr. 67-68). The ALJ then asked about "the hand packer position" at the medium level of exertion, which the VE indicated had 500 regional job availabilities and 8,000 national job availabilities. (Tr. 68).

In the ALJ's second hypothetical, she added a limitation that the person "would require no more than frequent handling," and the VE said the same answers would apply. (Tr. 68).

For the third hypothetical, the ALJ asked of a person needing "to have supervision on a regular basis or regular checks by a supervisor to determine if the work is being done as directed[,] would such a person be able to operate in the competitive market with that limitation in addition to the ones that I've given you in hypotheticals 1 and 2?" (Tr. 69). The VE indicated that this became work-preclusive if "[h]e still needs that after 30

12

days . . . ." (*Id.*). For aspects of his answers, the VE cited his "experience as a Vocational Counselor" as providing these answers. (*Id.*).

Cheney's attorney then asked the VE to assume an individual that would "typically be absent for two days during a typical month on a regular and ongoing basis," and the VE confirmed that this would "exclude all occupations." (Tr. 70).

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the

Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)      [D]aily activities;
    (ii)     The location, duration, frequency, and intensity of . . . pain;
    (iii)    Precipitating and aggravating factors;
    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude litigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law,

regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The applicable regulations explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Ultimately, the *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").

In *Drummond*, the Sixth Circuit held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843. The court later reaffirmed this principle in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See generally Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-*9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful

activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*[2]

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding.

To overcome this presumption, the Sixth Circuit has consistently anchored the analysis on the comparison between the "circumstances existing at the time of the prior decision and the circumstances existing at the time of review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). The court explained in a case predating *Drummond*: "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was

---

[2] Tension exists in the case law addressing whether *res judicata* applies to pre-hearing determinations. *Compare Wilson v. Califano*, 580 F.2d 208, 211 (6th Cir. 1978) (noting that *res judicata* can apply even where "no oral hearing was held before an ALJ on the prior application"), *with Asbury v. Comm'r of Soc. Sec.*, 83 F. App'x 682, 684 n.1 (6th Cir. 2003) ("We recognize that the applicability of the *Drummond* analysis is not clear with respect to administrative decisions that do not follow 'trial-type' hearings."). This heretofore unresolved issue can generate difficult questions, and courts typically will not address it unless raised and argued by the parties to a case. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-14797, 2015 WL 730094, at *3 n.2 (E.D. Mich. Feb. 19, 2015) (declining to address the doctrine's applicability to an initial determination in light of "the tensions in the case law and the parties' failure to raise the argument").

unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-1233 (6th Cir. 1993). The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration.[3] *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988, at *2, *8-*9. The relevant change in circumstances is not a change in the availability of evidence but a change in the plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter v. Heckler*, 771 F.2d 682, 691-93 (3d Cir. 1985) (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20

---

[3] I note, as well, that an equally important corollary to this principle dictates that an ALJ may not find *improvement* in a claimant's condition absent new and material evidence thereof following an already adjudicated period. *See, e.g.*, *Albanna v. Comm'r of Soc. Sec.*, 2016 WL 7238925, at *15 (E.D. Mich. Nov. 22, 2016) (Morris, M.J.) (finding an ALJ erred by calling the claimant's illiteracy into question based on "thinly substantiated doubts" where a prior decision found him illiterate); *see also Drummond*, 126 F.3d at 842-43; *Hamblin v. Apfel*, 7 F. App'x 449, 451 (6th Cir. 2001).

C.F.R. §§ 404.907, 416.1407. The more critical and complicated mechanism is reopening a prior ALJ decision.

The regulations pertaining to reopening permit the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F.R. §§ 404.987, 404.992, 416.1487, 416.1492. Either the claimant or the Commissioner can initiate the process. *Id.* A determination or decision may be reopened "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims, or four years for DIB claims. *Id.* §§ 404.988, 416.1488. Good cause exists if, among other reasons, "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened properly, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977). Courts may, however, review a decision *not* to reopen a case in order "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer*, 40 F. App'x at 690 ("'[W]e will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). Such a reopening occurs where the ALJ reviews the entire record, including portions from the already adjudicated period, and decides "the merits of the claim." *Tobak*, 195 F.3d at 186. One factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady_v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G.    Analysis

When the Appeals Council remanded, it instructed the ALJ to give "further consideration" to "whether a prior hearing decision is available for review, and if so, adopt the relevant findings from the prior final decision, in determining whether the claimant is disabled with respect to the period that has not yet been adjudicated, unless there is new and material evidence relating to such a finding, . . ." (Tr. 13) (internal quotation marks omitted). The ALJ addressed Cheney's 2006 RFC in her opinion and deviated from it because she found that new and material evidence showed a change of circumstances. (Tr. 19). Neither party has argued that the ALJ failed to apply the proper standard under *Drummond* and the relevant regulations.

Cheney puts forth two general arguments in his brief: (1) the ALJ failed to properly evaluate whether he met Listing 12.10; and (2) the ALJ improperly weighed opinions from Marinus Thoen, LMSW ("Dr. Thoen"), and Wallace Heller, M.D ("Dr. Heller"). I consider each argument in turn.

### 1.    Listing 12.10[4]

Cheney first notes correctly that "the ALJ's Step [Three] determination neglects to consider, analyze, or even explain whether [his] impairments meet or medically equal Listing 12.10." (Doc. 18 at ID 683). He further posits that this error was not harmless because "[t]aking the entirety of the evidence and facts together, along with the objective and clinical evidence, symptoms, and testimony outlined above . . . the evidence *could*

---

[4] At the time of the hearing, Listing 12.10 was identified as "pervasive development disorder," but it was later amended to "autism spectrum disorder." For the purposes of this opinion, these terms are used interchangeably.

reasonably meet or equal the relevant Listing/Listings." (Doc. 18 at ID 685). To this, the Commissioner suggests that Cheney "fail[ed] to make this argument with any specificity," noting that he "made no claims about any kind of autism spectrum disorder[] when asked why he was unable to work" and that the "treating source opinions upon which he relies make[] no mention of pervasive development disorder, . . ." (Doc. 21 at ID 710-11). As a result, the Commissioner avers that not only was the ALJ not required to evaluate Listing 12.10, but that even if she was, Cheney's condition could not have met or equaled Listing 12.10. (Doc. 21 at ID 711-12).

At the time of his second hearing, Listing 12.10 required Cheney to demonstrate either of the following sets of symptoms: (1) Subpart A: "[q]ualitative deficits in reciprocal social interaction," "[q]ualitative deficits in verbal and non-verbal communication and in imaginative activity," and a "[m]arkedly restricted repertoire of activities and interests"; or (2) Subpart B: "[q]ualitative deficits in reciprocal social interaction," "[q]ualitative deficits in verbal and nonverbal communication and in imaginative activity," and at least two of the following[5]—"[m]arked restrictions of activities of daily living"; "[m]arked difficulties in maintaining social functioning"; "[m]arked difficulties in maintaining concentration, persistence, or pace"; or "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. § 404, Subpt. P, App. 1.

As an initial matter, although an ALJ must find a claimant disabled where he meets a listing, "neither the listings nor the Sixth Circuit require the ALJ to 'address

---

[5] These criteria are also known as "paragraph B" criteria.

every listing' or 'to discuss listings that the applicant clearly does not meet." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013)). The ALJ here considered numerous listings—Listings 11.01, 12.02, 12.05, and 12.08, to be exact—but did not consider Listing 12.10. For this, Cheney imputes error to her analysis, suggesting at once that the record "raise[d] 'a substantial question as to whether [he] could qualified as disabled' under" Listing 12.10, and thus "[t]he ALJ should [have] discuss[ed]" that particular listing. *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).

"When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004). Yet, as the Commissioner observes, Cheney declines to furnish for this Court any citation to the record as support for the proposition that it could support a finding that Cheney met or equaled Listing 12.10. *See generally* (Doc. 18 at ID 682-85). Although he discusses relevant medical evidence at an earlier juncture in his brief, (Doc. 18 at ID 667-75), he nonetheless declines to juxtapose this evidence with the requirements of Listing 12.10, relying instead on the Court's willingness to piece the puzzle together on his behalf. This constitutes waiver. *Accord, e.g.*, *Dakroub v. Comm'r of Soc. Sec.*, No. 15-12484, 2016 WL 5539760, at *9 (E.D. Mich. Aug. 1, 2016), *report and recommendation adopted,* No. 15-12484, 2016 WL 540325 (E.D. Mich. Sept. 28,

2016) ("A claimant's failure to specifically detail, in a point-by-point fashion, how he or she meets a listing waives that argument.").

Even had Cheney sufficiently formulated this argument, he could not have prevailed. Much of the evidence relied upon arose long before December 17, 2010—the functional alleged onset date for his SSI claim—and pertained to an already adjudicated period in which the prior ALJ also declined to consider Listing 12.10, despite finding "pervasive developmental disorder" to be a severe impairment. (Tr. 373-74); *cf. Moore v. Colvin*, No. 14-12310, 2015 WL 4066735, at *4 (E.D. Mich. July 2, 2015) ("This Court has repeatedly stated that an ALJ is limited to considering medical evidence rendered after the alleged onset date."). Though such evidence is "not necessarily irrelevant" when considered "in the context of the entire record," *Daniel v. Colvin*, No. 1:14-CV-775, 2015 WL 5530210, at *4 (S.D. Ohio Sept. 21, 2015), the prospect that Cheney's condition as a twenty-year-old person, (Tr. 486)—or, for that matter, a seven-year-old person, (Tr. 396)—could carry his burden *now* seems remote, particularly where (as here) the ALJ plainly considered this evidence and reasonably discounted it. (Tr. 20) ("There is no *recent* medical evidence suggesting deficits of memory that would preclude understanding, remembering and carrying out simple tasks on a sustained basis . . . ." (emphasis added)); (*Id.*) ("The undersigned discounts the medical source opinions of [Dr. Heller] . . . . [who] cited two neuropsychological reports based on testing performed *more than 10 years earlier* (1991 and 2004)." (emphasis added)).

That this evidence, or the other evidence cited, might support finding that Cheney endured the dense cocktail of symptoms enumerated in either subpart A or B of Listing

12.10 seems unlikely. The ALJ appears to have recognized this, and made findings which would disqualify Cheney's meeting Listing 12.10 Subpart A, albeit in the context of other listings' criteria. (Tr. 17) ("He can make changes and handle personal finances. He shops for what he needs. He does household chores and yard work without encouragement. He can stay busy with hobbies in his free time. He builds control model automobile [sic], rebuilds computers, and watches television. He shops for parts on the internet."). Likewise, the ALJ thoroughly evaluated the "paragraph B" criteria required to meet Listing 12.10 Subpart B, and found only moderate difficulties with activities of daily living, social functioning, and concentration, persistence, and pace, as well as no extended episodes of decompensation. (Tr. 17). Cheney takes no issue with any of these findings.

Cheney's citations contain little to no evidence indicating a dearth in imaginative faculties or markedly restricted activities aside from vague assessments that he, for instance, "presents with a flat affect . . . ." (Doc. 18 at ID 675) (citing (Tr. 566)). And this Court, on independent review of the administrative record, could not find such evidence; indeed, much of the record evidence punctures Cheney's narrative. *Compare* (Tr. 327) (suggesting that Cheney plays video games, uses his computer, and rides his bike "every day to the [best] of his ability," and that he "chats online"), *and* (Tr. 538) ("He states that he really enjoys spending time on the computer. He would like to have a vehicle and be more mobile, and would like to have income that would provide him more access to activities and that would make him more content."), *and* (Tr. 460) ("It is reasonable to conclude that [Cheney's] level of intellectual functioning falls within the average range. .

. . [He] is presently seen as being competent to manage funds independently. The individual's ability to understand, remember and carry out simple and complex instructions in a work-related environment would be rated as fair."), *with Keresi v. Comm'r of Soc. Sec.*, No. 15-12675, 2016 WL 4154948, at *9 (E.D. Mich. May 20, 2016), *report and recommendation adopted,* No. 15-12675, 2016 WL 4138232 (E.D. Mich. Aug. 4, 2016) (Keresi's interest in fantasy books, television, film, videogames, and role playing permits a reasonable inference that she retains imaginative activity. No medical records contradict this conclusion."), *and Barber v. Comm'r of Soc. Sec.*, No. 615CV0338GTSWBC, 2016 WL 4411337, at *4 n.2 (N.D.N.Y. July 22, 2016), *report and recommendation adopted sub nom. Barber v. Colvin*, No. 615CV0338GTSWBC, 2016 WL 4402033 (N.D.N.Y. Aug. 18, 2016) ("The record indicated that Plaintiff did not show any difficulties with creativity and imagination and this was an area of strength."), *and Venable v. Astrue*, No. CIV. 4:07-CV-04075, 2008 WL 4018124, at *5 (W.D. Ark. Aug. 25, 2008) ("The record does not support a finding of deficits in imagination activity. Plaintiff testified he enjoys listening to music and playing on his computer.").

For these reasons, Cheney's Listing 12.10 argument should be rejected.

### 2. Opinions of Drs. Thoen and Heller

In his second argument, Cheney suggests the ALJ wrongly discounted, in violation of the treating physician rule, the opinions his "longtime treating counselor" Dr. Thoen, as well as Dr. Heller, whose "well-supported findings" were "consistent with substantial evidence." (Doc. 18 at ID 686).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

As a prelusory matter, and as the Commissioner notes, Cheney fails to develop any argument attacking the ALJ's treatment of Dr. Heller, whose name appears once in Cheney's argument section before disappearing entirely. For this reason, Cheney has waived any argument thereto. *Accord Krzyaniak v. Comm'r of Soc. Sec.*, No. 13-12137, 2014 WL 4209599, at *3 (E.D. Mich. Aug. 26, 2014) ("A skeletal argument, really

nothing more than an assertion, does not preserve a claim." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) (internal quotation marks omitted)).

Cheney's argument, therefore, rests on Dr. Thoen. As a therapist, Dr. Thoen is not an acceptable medical source. *See* SSR 06-03p, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006) (therapists are "other sources" rather than "acceptable medical sources"). Although ALJs cannot simply ignore 'other sources,' *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378-79 (6th Cir. 2013) (ALJs must evaluate opinions from therapists), neither must they accord "any particular weight or deference" to such an opinion—"the ALJ has discretion to assign [such opinions] any weight he feels appropriate based on the evidence of record," *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015). Indeed, the ALJ in this case plainly considered Dr. Thoen's opinion—*see* (Tr. 21) (acknowledging Dr. Thoen's concerns and explaining how she accounted for them)—and incorporated limitations Dr. Thoen prescribed into the RFC. *Compare* (Tr. 532) ("[Cheney] would have great difficulty surviving in a competitive work environment due to having difficulty following detailed multi-level instructions, changing demands of a job, working at a pace that requires speed beyond his comfort zone, work at a site requiring ongoing interaction with coworkers, and being harshly confronted/corrected. It is also my impression that he would work best by himself and where his obsessive traits will be tolerated, while being able to set his own pace."), *with* (Tr. 18) (limiting Cheney to "no work with the general public, no operating at a production pace, and no work with groups over five people in proximity to the work area" as well as "simple, routine tasks such as those in jobs rated at the SVP 1-2 level").

Time and again, courts in this circuit have found analyses similar to the one at issue here sufficient, and reaffirmed that the ALJ need not meticulously "outline which portions of [Dr. Thoen's] opinion she accepts and which part she rejects," as Cheney supposes. (Doc. 18 at ID 688); *e.g.*, *Pitts v. Comm'r of Soc. Sec.*, No. 14-12204, 2015 WL 12712080, at *4 (E.D. Mich. Aug. 6, 2015), *report and recommendation adopted,* No. 14-CV-12204, 2015 WL 5634648 (E.D. Mich. Sept. 24, 2015) ("Although the ALJ must consider many factors in weighing the opinion of an 'other source,' the ALJ need only generally explain the weight given to such opinion."); *Dennis v. Comm'r of Soc. Sec.*, No. 13-12754, 2014 WL 4639511, at *21 (E.D. Mich. Sept. 16, 2014) ("The ALJ is under no obligation to explain each piece of evidence in the record." (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006))). Even assuming the ALJ's evaluation faulty could not help Cheney, however, as he fails to demonstrate any resulting prejudice—indeed, on additional limitations the ALJ should have pulled from Dr. Thoen's opinion, Cheney remains silent. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("Lower court cases make clear that courts have correlated review of ordinary administrative proceedings to appellate review of civil cases . . . . Consequently, the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *see also, e.g.*, *Cygan v. Comm'r of Soc. Sec.*, No. 14-14356, 2016 WL 1128087, at *3 (E.D. Mich. Mar. 23, 2016) ("[I]t is Plaintiff's burden to show that he was harmed by the acknowledged error in the ALJ's step three analysis."); *Grover v. Comm'r of Soc. Sec.*, No. 1:11-CV-1208, 2013 WL 3049086, at *12 (W.D. Mich. June 17, 2013) ("Plaintiff, as the party attacking the agency's determination, has the burden of

showing that the error was harmful."); *Beckrow v. Comm'r of Soc. Sec.*, No. 11-CV-13169, 2012 WL 1564669, at *14 (E.D. Mich. Apr. 12, 2012), *report and recommendation adopted,* No. 11-13169, 2012 WL 1560463 (E.D. Mich. May 2, 2012) (refusing to indulge a similar argument because the plaintiff failed to "specify what additional limitations the ALJ should have, but did not, include in the RFC assessment").

For these reasons, the Court should find Cheney's argument as to the ALJ's weighing of medical sources unavailing.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Cheney's Motion for Summary Judgment, (Doc. 18), be **DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and that this case be **AFFIRMED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human*

*Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 15, 2017                        S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 15, 2017                        By s/Kristen Castaneda
                                           Case Manager